223 So.2d 605

**Otis SMITH**

**v.**

**STATE.**

**3 Div. 352.**

Court of Appeals of Alabama.

Feb. 18, 1969.

Rehearing Denied April 1, 1969.

Jas. D. Straiton, Montgomery, for appellant.

MacDonald Gallion, Atty. Gen., and Richard F. Calhoun, Asst. Atty. Gen., for the State.

CATES, Judge.

Smith appeals from a grand larceny conviction carrying a two-year prison term.

### I.

Lewis Bates testified that in July, 1967, he broke and entered Clardy's, an establishment where he had worked that day. He testified:

"Q  It was your idea?

"A  Yes, sir.

"Q  Who did it with you?

"A  Ed and Larry.

"Q  Ed who?

"A  Larry Barnett.

"Q  Leroy Burnett?

"A  Yes.

"Q  And who else?

"A  That's all.  We broke into the place.

"Q  You broke into the place first.  Is that right?

"A   Yes.

"Q   What did you get out of there?

"A   Televisions."

Smith was not then with Bates and the other or others. Bates later importuned Smith into helping take the televisions away. Of this Bates said on direct:

"Q   *   *   *   What did you do?

"A   We went back and got the televisions.

"Q   You mean he went back with you?

"A   All of us went back.

"Q   The same ones you mentioned before that had broken into the place. Is that right?

"A   That's right.

"Q   Now, whose automobile or whose vehicle did you go back there in?

"A   He was driving. I don't know who it belonged to.

"Q   Who was driving?

"A   It was another boy and he drove some and the other boy drove some.

"Q   Now, who is 'he'? Are you talking about Otis Smith here?

"A   It was another boy. He drove to the place and Otis drove away from the place.

"Q   I didn't follow you there. What happened?

"A   There was another boy driving the car and Otis drove away from there.

"Q   He drove away from Clardy's after you had loaded up the TV sets.

"A   That's right.

"Q   Do you know who that other boy was who drove his car back?

"A   That was the first time I seen him.

"Q   That was the first time you seen him.

"A   The other boy.

"Q   What did you do when you arrived back at Clardy's after you had broken into it sometime before?

"A   We just came back and got the televisions. That's all.

"Q   Who got the televisions?

"A   Me and Ed—we loaded them up and he drove to Larry's house.

"Q   You mean, the Defendant, Otis, drove to Larry's house?

"A   That's right.

"Q   And that's Leroy Burnett. Is that right?

"A   That's right."

The group was hauling the television sets in a pickup truck. The bulk of them were delivered to the apartment of Larry (or Leroy) Burnett in a low rent housing project.

Then with Smith driving the party took one set to the house of a girl whom Smith knew. This house was on the west side of town. Bates and Smith carried the set in the house.

Velma Lewis, Smith's sister, testified for the State:

"Q   Do you remember your brother coming over there to your house with a TV set one night during July of 1967?

"A   No, I don't. I don't remember my brother bringing a TV in the house.

"Q   All right. Do you remember somebody bringing a TV set over there?

"A   Yes, sir.

"Q   All right. Who was that?

"A   It was two boys. I didn't know their names and I had never seen them before.

"Q   But you are saying that your brother was not one of them?

"A   I am saying he wasn't with them.

"Q All right. Was he outside?

"A He could have been.

"Q Did the people who came in there tell you that he was outside?

"A No, they didn't tell me he was outside.

"Q All right. What did they do?

"A Well, they brought the TV in and set it on the floor and then they hooked it up to see would it play.

\* \* \* \* \* \*

"Q So, two strangers just came in there and put a TV set in your house.

"A They brought it there to sell it.

"Q To sell it to who?

"A To me.

"Q What time of day or night was this?

"A I believe it was after twelve. Way after twelve. I don't know exactly what time it was.

"Q It was way after twelve o'clock at night?

"A Yes.

"Q Were you expecting them?

"A No, I wasn't expecting anyone.

"Q Who was there with you at the time?

"A Me and my two children.

"Q Just you and your two children.

"A. Yes sir.

"Q And they brought these two TV sets there in your house?

"A Yes, they did.

"Q What kind of TV set was it?

"A A color TV.

"Q Do you know the make?

"A No, I don't.

"Q Was it a Dumont? Do you remember?

"A I don't remember. I don't know what it was.

"Q What did you do with the TV set, Velma?

"A I let it set on the floor all night long, and went back to bed."

On cross-examination Velma stated that one of the two men who brought in the television was Lewis Bates.

She further testified that Smith came in about fifteen or twenty minutes after the strangers had deposited the set in her house. Then, twenty-five or thirty minutes later Velma Lewis's husband came home in an intoxicated condition.

## II.

When the prosecution first presented Lewis Bates as a witness, counsel for the defendant objected to this order of proof, asserting that proof of corroboration must precede the testimony of an accomplice. Until the State finally rests its case, the lack of corroboration cannot be claimed either in fact or law.

In Alexander v. State, 281 Ala. 457, 204 So.2d 488, Harwood, J., wrote:

"The three usual methods to present the law question of lack of corroboration to the trial court is by (1) a written or oral motion to exclude the state's evidence, or (2) by a written request for the affirmative charge, or (3) by a timely filed and presented motion for a new trial asserting the lack of corroboration as a ground of the motion. Leonard v. State, 43 Ala.App. 454, 192 So.2d 461.

"When none of the above methods is invoked, the trial court has not been presented with an opportunity to rule on this question of law, and therefore cannot be cast in error under the circumstances."

In Leonard v. State, 43 Ala.App. 454, 192 So.2d 461, we observed:

"The testimony of the accomplice as evidence remains, as it were, inchoate to be quickened only by other evidence. In effect, it remains in limbo as no evidence at all."

■ To belabor the obvious—the order of proof is within judicial discretion. A claim that an accomplice's testimony is prejudicial fails to point out any invasion of a right. After all, any evidence tending to support an indictment is prejudicial to the defendant. The State has a right to prove its case to the hilt.

■ Hence, the trial judge correctly overruled the instant objection to the State's taking one Lewis Bates as its first witness.

### III.

When the State rested, the defense moved to exclude the State's evidence because Lewis Bates's testimony was not corroborated as is required by our statute in felony trials.

This enactment is Code 1940, T. 15, § 307, which reads:

"§ 307. A conviction of felony cannot be had on the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."

This court uses a measuring formula to test the threshold question of law as to whether there has been any evidence connecting the defendant with the commission of the felony. Evans v. State, 42 Ala. App. 587, 172 So.2d 796; Leonard, supra; King v. State, 44 Ala.App. 119, 203 So.2d 466.

■ The clearest exposition of this basic quantitative rule is laid down in ·Wharton's Criminal Evidence (12th Ed.), § 468, Sufficiency of corroboration, which says:

"By judicial decision and by express statutory provision, the corroboration of an accomplice, when necessary, is not sufficient if it merely shows the commission of the offense, or the circumstances thereof, or that the accomplice and the defendant are acquainted or connected. There must be independent evidence supporting the testimony of the accomplice or tending to confirm him, which must be of a substantive character, and must tend to connect the defendant with the commission of the crime charged or to identify him as the guilty person, and which is inconsistent with his· innocence.

"It has been stated that the proper test in determining whether there has been sufficient corroboration of the testimony of an accomplice, according to statutory requirements, is first to eliminate the evidence of the accomplice, and then, if upon examination of all the other evidence there is sufficient inculpatory evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration."

We consider that all of these measurements were laid down by Mr. Justice Simpson in the benchmark case of Sorrell v. State, 249 Ala. 292, 31 So.2d 82 (1), (2), (3). The analysis involves taking away the accomplice's story then testing the rest of the State's proof.

In brief the Attorney General argues:

" * * * on the night of July 13, 1967, at a time subsequent to the time of the commission of the offense that night, the testifying accomplice, Lewis Bates, and another boy, who were both total strangers to Velma Lewis at the time, carried a color television set into her house; that the defendant happened to

enter the house some fifteen or twenty minutes later, according to his sister's testimony; that the same color television, having been identified as one stolen from Clardy's on the night of July 13, 1967, was recovered by the police from the home of Velma Lewis thirteen days later; that an automobile, readily distinguishable from conventional automobiles because of the unusual structure of its body and meeting the description given by Bates of the vehicle used in the larceny, was observed parked in front of the residence of the defendant on at least two separate occasions subsequent to July 13, 1967.

"* * * Bates' testimony was to the effect that he did not know whose house they went to, other than that it was the house of some girl. But there can be no logical basis for doubt as to the identity of this girl: on the night in question, the defendant, undirected, drove them to her house; one color television was taken into her house; the defendant knew the girl and was left at her house by his accomplices; the defendant's sister admitted that he came to her house that same night only fifteen minutes after Lewis Bates and another had placed a color television (the one recovered by the police) inside the house and that the defendant remained there that night.

"The Appellant also contends that 'finding the television at Velma Lewis' house would only corroborate that portion of Lewis Bates' testimony that "showed the commission of the offense or the circumstances thereof."' (Appellant's Brief, p. 11). On the contrary, the facts of the case set out above show concretely that the finding of the color television taken from Clardy's at the house of Velma

Lewis corroborated the entire substance of Bates' testimony connecting the defendant with the commission of the offense. * * *"

The stolen colored television came into Velma Lewis's house. Smith, who did not live there, came in fifteen or twenty minutes later. Velma Lewis was Smith's sister.

A detective testified that a Ford "Ranchero," i. e., a fancy pickup truck was parked on the street on which Smith lived on at least two unspecified occasions *after* the burglary at Clardy's. No attempt was made to introduce a copy of a license tag receipt or bill of sale for this vehicle.

Bates did not know who owned the pickup truck which the thieves used. Nor was his description of it precise in any detail aside from the passengers and the itinerary.

No doubt the jury thought that Velma Lewis perjured herself for the sake of her brother. Perhaps the trial judge did, too.[1] However, when her testimony is sifted and the suspicious parts are eliminated nothing is added except a surmise.

Such a negative vacuum cannot supply a silent positive assertion. Suppressio veri, expressio falsi without more cannot sub silentio be converted into a double entendre of truth.

This is the main risk of our statute, § 307, supra. Nevertheless, it has been on the books long enough so that its pitfalls are notorious.

Concededly, the presence of the stolen television set would have supported an inference of larceny (or receiving) on the part of Velma Lewis. But Smith is not

1. A pretrial examination of Velma Lewis and her husband was conducted in the judge's chambers on the day of trial but before a jury had been chosen. In moving for this unusual proceeding, the assistant district attorney claimed discrepancies between what Velma Lewis had told the investigating officers and what she later told the assistant district attorney. This mode of obtaining testimony has no statutory authorization since Stat. 16 Car. I, c. 10. See Ex parte Denton, 266 Ala. 279, 96 So.2d 296.

linked. Parish v. State, 28 Ala.App. 81, 179 So. 387.

■ Other than Bates's testimony, the State has adduced no proof tending to connect the defendant with the commission of the offense charged. The remainder of the evidence shows merely a larceny and its attendant circumstances. That Smith was an actor in the crime, is left only to speculation.

The motion to exclude was due to have been granted; the judgment below is reversed and the cause is remanded for new trial.

Reversed and remanded.